In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3577

S.C. JOHNSON & SON, INC.,

*Plaintiff-Appellant*,

*v.*

TRANSPORT CORPORATION OF AMERICA, INC., *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 10-CV-00681—**C. N. Clevert, Jr.**, *Chief Judge.*

ARGUED MAY 29, 2012—DECIDED SEPTEMBER 21, 2012

Before WOOD, SYKES, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* Injured by a bribery and kickback scheme hatched by a dishonest employee and some transportation companies, S.C. Johnson & Son, Inc., fought back with two lawsuits. The first was a civil lawsuit in Wisconsin state court, in which it raised several tort claims against a number of transportation companies. This is the second one, filed against different defendants in federal court. Relying on the court's diver-

sity jurisdiction, S.C. Johnson raised a number of state-law claims, including one based on the state law prohibiting bribery and another under Wisconsin's counterpart to the federal Racketeer Influenced and Corrupt Organizations Act, commonly known as RICO. See 18 U.S.C. §§ 1961 *et seq.* The district court dismissed the action, believing that federal law preempts the company's state tort claims because they could have "the force and effect of a law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). We reverse. We conclude that S.C. Johnson's claim for fraudulent misrepresentation was properly dismissed, but that its theories based on bribery and kickbacks fall outside the scope of the preemption provision. We find it unnecessary to discuss its theory based on aiding and abetting breach of a fiduciary duty, because (as it admits) this is time-barred. S.C. Johnson is therefore entitled to move forward with these aspects of its case.

**I**

S.C. Johnson is a manufacturer of domestic and personal care products; it sells these products both within the United States and internationally in over 100 countries. It handles distribution internally, through its Transportation Department. From 1988 through October 2004, Milton Morris was the director of that department. It was his job to select carriers to transport goods for the company, to negotiate contracts with them, and to authorize payments. The annual budget of the Transportation Department was roughly $90 million.

In early 2004, S.C. Johnson became aware that there were problems in its transportation operations. It investigated and learned to its dismay that Morris was dishonest to the core. He had received hundreds of thousands of dollars in cash, goods, travel, and services (licit and illicit, it seems—including prostitutes) from various carriers. In exchange, Morris provided favorable treatment to the donor-carriers; for example, he awarded to some carriers business that they would not otherwise have received and for others he caused S.C. Johnson to pay above-market rates. Johnson terminated Morris's employment on October 18, 2004. Morris was later criminally prosecuted and convicted for these actions.

S.C. Johnson filed suit against Morris in the Circuit Court of Racine County, Wisconsin, on the day that it fired him. Over time, it added as defendants four trucking companies and their owners, all of whom allegedly conspired with Morris, and then later added another two companies and three of their employees, as well as another former S.C. Johnson employee, Katherine Scheller. In that civil case, S.C. Johnson asserted five tort claims: (1) fraudulent misrepresentation by omission; (2) civil conspiracy to violate the Wisconsin bribery statute, WIS. STAT. § 134.05; (3) civil conspiracy to commit fraud; (4) violation of the Wisconsin Organized Crime Control Act (WOCCA), WIS. STAT. § 946.80; and (5) aiding and abetting a breach of fiduciary duty. Some of the carrier-defendants moved to dismiss the case on the ground that S.C. Johnson's claims were preempted by the Federal Aviation Administration Authorization Act of 1994 (FAAAA), which (despite the name)

includes a section providing that states "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). The state court rejected that defense, ruling that Johnson's claims were based not on the amount that was charged, but on the tortious nature of the defendants' alleged bribery, conspiracy, fraud, and racketeering activities.

S.C. Johnson ultimately prevailed in the Racine County case against eight of the defendants and was awarded a judgment of $203.8 million. It settled with two other defendants. The defendants in the present case, however, were not among those named in the state court suit. S.C. Johnson explains that it was only after it initiated the state suit that it learned that Morris's scheme had reached even more entities. This discovery led to the case that is now before us.

On August 10, 2010, S.C. Johnson filed its complaint against Transport Corporation of America, Inc. (Transport), Stevens Transport, Inc., Far Side Trucking, Inc., and Graham Kent Pharr (collectively, the Carriers) in the U.S. District Court for the Eastern District of Wisconsin, relying as we said on the court's diversity jurisdiction. Although the defendants were different from those in the Racine County case, the allegations were essentially the same. The complaint asserted that the Carriers had conspired with Morris to exchange bribes for favorable treatment, such as awarding them business they would not otherwise have received and causing S.C. Johnson to

pay above-market rates. For example, the Carriers allegedly picked up Morris's tab for extravagant business travel on many occasions. Perks included meals, golf, stays at luxury hotels, and the provision of prostitutes. S.C. Johnson also alleged that Morris received substantial cash bribes from the Carriers during his tenure in the Transportation Department. In all (including payments from companies involved in the state case), Morris deposited over $1.2 million in addition to his legitimate compensation from S.C. Johnson into various accounts.

Without reviewing every detail, we can say that S.C. Johnson's complaint alleged numerous ways in which the alleged tortious conduct of Morris and the Carriers harmed it. Because of the bribes and kickbacks, S.C. Johnson paid more for transportation services than it would have done in a market untainted by these acts. In addition, the tortious conduct distorted its choice of transportation providers. Its theories of liability focus on "unnecessary awards of business" to the Carriers, noncompetitive terms, conspiracy to commit bribery in violation of state law, fraud for failing to disclose the true (unlawful) basis of the transactions, violations of Wisconsin's state-law equivalent to RICO, and the Carriers' aiding and abetting Morris's breach of an alleged fiduciary duty owed to S.C. Johnson as its Director of the Transportation Department.

As their counterparts had done in state court, the Carriers moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint on the ground that every count

was preempted by federal law, pursuant to the FAAAA, 42 U.S.C. § 14501(c)(1). (Preemption is an affirmative defense, we note, and thus the more appropriate motion would have been one under Rule 12(c); plaintiffs have no duty to anticipate affirmative defenses, and we cannot say in this case that S.C. Johnson pleaded itself out of court. But no one has made anything of this point, and so we will let it pass.) This time, the effort succeeded. The district court was persuaded that the state laws on which S.C. Johnson wished to rely were all provisions "having the force and effect of law related to a price, route, or service of any motor carrier." It phrased the question before it as "whether enforcement of the state laws underlying a claim asserted in the complaint in this case relates to plaintiff's prices, routes, or services by either expressly referring to them or having a significant economic effect upon them." Finding that the answer was yes, the court concluded that preemption necessarily followed. It also ruled in the alternative that the claim for aiding and abetting a breach of fiduciary duty was time-barred. It thus granted the Carriers' motion to dismiss, and this appeal followed.

## II

### A

The United States began its great experiment in the regulation of the transportation industry (and eventually others) with the passage in 1887 of the Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887). Under that authority, the Interstate Commerce Commission first regulated

the nation's railroads; the Motor Carrier Act of 1935, 49 Stat. 543, added the trucking business to the ICC's responsibilities. Three years later Congress provided for the regulation of the airline business in the Civil Aeronautics Act of 1938, 52 Stat. 973. This regime lasted approximately four decades, but by the time President Carter took office, the movement to deregulate these and other sectors was picking up steam. See, *e.g.*, Andrew Downer Crain, *Ford, Carter, and Deregulation in the 1970s*, 5 J. TELECOMM. & HIGH TECH. L. 413 (2007). Advocates of deregulation had become convinced that industry control of the regulatory apparatus had led to protection of industry incumbents and higher prices, and that deregulation would bring with it a healthy competitive process that would better advance consumer welfare and lead to re-invigorated innovation. See, *e.g.*, Stephen Breyer, *Afterword, Symposium: The Legacy of the New Deal: Problems and Possibilities in the Administrative State (Part 2)*, 92 YALE L.J. 1614, 1616 (1983).

Efforts to deregulate the airline industry found a warm welcome in the Carter White House. President Carter appointed Alfred Kahn, a well-known supporter of deregulation, to head the Civil Aeronautics Board (CAB) in 1977, and Kahn went right to work. Both regulatory reform and legislative reform came along in quick order. Under Kahn, the CAB lifted restrictions on charter companies, allowed airlines much greater flexibility in setting fares, and eliminated rules requiring that first-class fares be 50% higher than coach fares. See, *e.g.*, *Sharp Relaxing of Air-Fare Regulations Planned by CAB in Drive to Cut Controls*, WALL ST. J., Apr. 4, 1978, at 8. Congress took a

more comprehensive approach in legislation beginning with the Air Cargo Deregulation Act, Pub. L. No. 95-163, 91 Stat. 1278. It followed up with the Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705. In time, the CAB was dissolved and the skies were open for competition.

Trucking deregulation followed in 1980, launched by the Motor Carrier Act of 1980, Pub. L. No. 96-296, 94 Stat. 793. That statute lifted most restrictions on entry, on the goods that truckers could carry, and on routes. It did not, however, eliminate the requirement to file tariffs, nor did it end the power of state regulatory commissions to limit entry and regulate prices. Fourteen years later, Congress decided to finish the job by first passing the Federal Aviation Administration Authorization Act of 1994, Pub. L. No. 103-305, 108 Stat. 1569 (Title VI of which addressed "Intrastate Transportation of Property" by both air and motor carriers), and then the Trucking Industry Regulatory Reform Act of 1994, Pub. L. No. 103-311, 108 Stat. 1673. In 1995, Congress dissolved the Interstate Commerce Commission. ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803.

As we will see in a moment, the Supreme Court has generally taken the position that the statutes deregulating the airline industry and those deregulating the trucking industry should be construed consistently with one another. It is therefore not surprising that the statute of greatest concern to us in this case, section 601 of the FAAAA, addresses both air and motor carriers. That section opens with the following findings:

(a) FINDINGS.—Congress finds and declares that—

(1) the regulation of intrastate transportation of property by the States has—

(A) imposed an unreasonable burden on interstate commerce;

(B) impeded the free flow of trade, traffic, and transportation of interstate commerce; and

(C) placed an unreasonable cost on the American consumers; and

(2) certain aspects of the State regulatory process should be preempted.

FAAAA § 601(a), 49 U.S.C. § 11501 note. Congress decided to address these concerns through the device of preemption; section 601(c)(1) sets out the operative language for the trucking industry:

(c) TRANSPORTATION BY MOTOR CARRIER.—Section 11501 is amended by adding at the end the following new subsection:

"(h) PREEMPTION OF STATE ECONOMIC REGULATION OF MOTOR CARRIERS.—

"(1) GENERAL RULE.—Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air

carrier covered by section 41713(b)(4) of this title) or any motor private carrier with respect to the transportation of property.

FAAAA § 601(c), codified at 49 U.S.C. § 11501. The statute lists some exceptions to this rule, but none is pertinent to our case.

We can now refine the question before us as follows: which, if any, of the state-law theories set forth in S.C. Johnson's complaint qualifies as "a law, regulation, or other provision having the force and effect of law related to a price, route, or service" of a motor carrier? S.C. Johnson relies on five different Wisconsin laws (some statutory and some common-law): (1) fraudulent misrepresentation by omission; (2) criminal conspiracy to violate Wisconsin's bribery statute, WIS. STAT. § 134.05; (3) conspiracy to commit fraud; (4) the Wisconsin Organized Crime Control Act (WOCCA), WIS. STAT. § 946.80 through racketeering activity and mail and wire fraud; and (5) aiding and abetting a breach of fiduciary duty by providing bribes and kickbacks. Before essaying a definitive answer to those questions, we turn first to a review of the decisions of the Supreme Court, this court, and our sister circuits on these points.

B

1

Three decisions of the Supreme Court are of particular relevance to our inquiry, and so we begin with them: *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374 (1992);

*American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995); and *Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364 (2008). Taken together, these cases provide an outline of the approach to preemption that should govern this case.

*Morales* addressed the question whether the Air Travel Industry Enforcement Guidelines adopted by the National Association of Attorneys General (NAAG) were preempted by the Airline Deregulation Act of 1978 (ADA), 49 U.S.C. App. § 1304(a)(1). The Guidelines contained "detailed standards governing the content and format of airline advertising, the awarding of premiums to regular customers (so-called 'frequent fliers'), and the payment of compensation to passengers who voluntarily yield their seats on overbooked flights." 504 U.S. at 379. Acting pursuant to their powers under their respective state consumer protection statutes, the NAAG members issued and proposed to enforce the Guidelines as a way of eliminating allegedly deceptive practices from airline fare advertisements.

The Supreme Court held that the ADA preempted all state enforcement actions that have "a connection with or reference to airline 'rates, routes, or services.'" *Id.* at 384, citing 49 U.S.C. App. § 1305(a)(1). It rejected a reading of the statute that would preempt only the direct setting of rates, routes, or services, on the ground that such an approach would read the words "relating to" out of the statute. It also held that the preemption clause was not limited to state laws specifically addressed to the airline industry; laws of

general applicability with a significant effect on rates, routes, or services are also covered. Finally, the Court found that the NAAG Guidelines "quite obviously" related to fares. 504 U.S. at 387. "[C]ollectively, the guidelines establish binding requirements as to how tickets may be marketed if they are to be sold at given prices." *Id.* at 388. Citing the antitrust case of *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977), the Court noted that "as an economic matter" restrictions on fare advertising have "the forbidden significant effect upon fares." 504 U.S. at 388; see also *California Dental Ass'n v. FTC*, 526 U.S. 756, 777-78 (1999).

The Court went out of its way, however, to disclaim any intent to read the statute as preempting any and all state laws that might indirectly affect fares, routes, or services. State laws against gambling and prostitution, as applied to airlines, would not be preempted, it indicated, and it specifically reserved the question "whether state regulation of the nonprice aspects of fare advertising (for example, state laws preventing obscene depictions) would similarly 'relat[e] to' rates; the connection would obviously be far more tenuous." *Id.* at 390. It reaffirmed what it had said in *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21 (1983): "Some state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner' to have pre-emptive effect." 504 U.S. at 390. *Morales* thus demonstrates that we are not looking at a simple all-or-nothing question; instead, the court must decide whether the state law at issue falls on the affirmative or negative side of the preemption line.

*Wolens* was another case in which the immediate question before the Court had to do with preemption under the ADA. The focus there was squarely on the airline's frequent flier program: Participants had sued on the theory that some retroactive changes in the program violated Illinois's Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505, and constituted a breach of contract. These changes, plaintiffs alleged, devalued the credits that they had earned; they sought monetary relief. The Supreme Court of Illinois held, favorably to the plaintiffs, that the ADA's preemption clause applied only to state laws that "specifically relate to" and "have more than a tangential connection with" the airline's rates, routes, or services. In a decision written after a remand for reconsideration in light of *Morales,* the state supreme court adhered to that judgment and held that the suit was not pre-empted. Frequent flier programs, it wrote, are peripheral to the operations of an airline and thus outside the scope of the ADA's preemption for purposes of both the consumer fraud theory and the contract theory.

The Supreme Court reversed to the extent that the state court had allowed the consumer fraud theory to go forward; it affirmed to the extent that the court held that the breach-of-contract claim was not preempted. 513 U.S. at 226. It rejected the Illinois court's distinction between matters that are "essential" to airline operations and those that are not, writing that

> Plaintiffs' claims relate to "rates," *i.e.*, American's charges in the form of mileage credits for free

tickets and upgrades, and to "services," *i.e.*, access to flights and class-of-service upgrades unlimited by retrospectively applied capacity controls and black-out dates.

*Id.* But, the Court continued, the ADA's preemption clause contains another limitation: it applies only to the enactment or enforcement of any "law" relating to rates, routes, or services. With that in mind, it turned to the two theories presented by the *Wolens* plaintiffs.

Looking first at the consumer fraud statutory theory, the Court reiterated its holding in *Morales* that there is an inherent potential in state consumer protection laws for intrusive regulation of airline marketing practices. *Id.* at 227. The ADA was designed "to leave largely to the airlines themselves, and not at all to the States, the selection and design of marketing mechanisms appropriate to the furnishing of air transportation services." *Id*. at 228. To the extent problems arise, the Court finished, the federal Department of Transportation has the authority to address them. *Id.* at n.4. The breach of contract claim was another matter. The recovery sought there was "solely for the airline's alleged breach of its own, self-imposed undertakings." *Id.* at 228. Private ordering of this type falls outside the scope of the ADA's preemption provision. Instead, it furthers the statutory goal of "maximum reliance on competitive market forces." *Id*. at 230, quoting from 49 U.S.C. App. § 1302(a)(4). Preserving state contract-law theories is also consistent with Congress's retention of the savings clause in the Federal Aviation Act of 1958, 49 U.S.C. App. § 1506,

which preserves "the remedies now existing at common law or by statute." 513 U.S. at 232. Finally, the Court concluded with an explicit recognition of the line-drawing task presented in *Wolens*: what does the ADA preempt, and what is left for private ordering? *Id.* at 234. By answering that preemption has its limits, the Court demonstrated that a similar problem might arise in other settings.

The third leg in this legal tripod is *Rowe,* which unlike *Morales* and *Wolens* dealt with the FAAAA. At the outset, the Court confirmed that Congress drew from the ADA when it wrote the FAAAA's preemption section, 49 U.S.C. § 14501(c)(1). 552 U.S. at 368, 370. Throughout the *Rowe* opinion, the Court drew liberally from *Morales*, and so we are confident that we too should rely as need be on the ADA decisions. The question before the Court in *Rowe* was whether to find preemption of a Maine statute regulating tobacco shipments. The state law begins by forbidding anyone other than a Maine-licensed tobacco retailer to accept an order for delivery of tobacco. It then requires retail recipients of tobacco shipments to use an elaborate recipient-verification service. Finally, it forbids any person knowingly to transport a tobacco product to someone in Maine unless either the sender or the receiver has a Maine license, and it adds that a person is deemed to know that the package contains a tobacco product if it is marked in a certain way or if the sender's name appears on a list compiled by Maine's Attorney General of *un*-licensed tobacco retailers. A group of carrier associations challenged the "recipient-verification"

and "deemed-to-know" provisions of the law as pre-empted by the FAAAA.

The Supreme Court derived several general principles from *Morales*:

> (1) that "[s]tate enforcement actions having a con-nection with, or reference to" carrier " 'rates, routes, or services' are pre-empted," (2) that such pre-emption may occur even if a state law's effect on rates, routes or services "is only indirect"; (3) that, in respect to pre-emption, it makes no difference whether a state law is "consistent" or "inconsistent" with federal regulation; and (4) that pre-emption occurs at least where state laws have a "significant impact" related to Congress' deregulatory and pre-emption-related objectives.

552 U.S. at 370-71 (internal citations omitted). It again acknowledged, however, that "federal law might not preempt state laws that affect fares in only a 'tenuous, remote, or peripheral . . . manner," *id.* at 371, and gave the example of state laws forbidding gambling. It confirmed that the Court has not yet said where or how it would draw this line, because the cases thus far have not been close ones. *Id.*

Applying those principles, the Court unanimously concluded that the challenged provisions of the Maine law were preempted. It is hard to say that a law expressly directed at the method of delivery—arguably the critical moment in a shipment—does not affect "rates, routes, or *services*." (Emphasis added.) Such a prescrip-

tion for the method of delivery is inconsistent with the statute's deregulatory purpose, since it imposes one system for those that the market might develop. The "deemed-to-know" provision, the Court concluded, also conflicted with the FAAAA's preference for deregulated, competitive markets because it dictated the way in which carriers had to inspect every shipment. The Court was not impressed with the state's argument that the rules were not likely to impose significant additional costs, finding this irrelevant to the issue at hand, nor was it prepared to create a public-health exception to the FAAAA that Congress did not authorize. At the same time, the Court disclaimed any intention to hold that the statute "generally preempts state public health regulation." State laws that are general and that affect truck drivers solely in their capacity as members of the public would not be preempted. *Id.* at 375-76.

2

We also find it useful to review the way in which the courts of appeals have applied the principles in the *Morales-Wolens-Rowe* line of cases. (This is not a comprehensive list of every case that has ever touched on these statutes; we have chosen illustrative examples for present purposes, and we refer to other relevant decisions later in our opinion.) We discuss first several cases that have found preemption, and then we look at those that have not.

a

In *United Airlines, Inc. v. Mesa Airlines, Inc.,* 219 F.3d 605 (7th Cir. 2000), United Airlines sought a declaratory judgment confirming that it had the right to replace one regional airline (Mesa) with another on eight routes out of Los Angeles. Eventually, the case also involved Mesa's and WestAir's claims that United was retaining too much revenue for itself on certain Denver routes. With respect to the latter claims, Mesa and WestAir sought damages on four theories: breach of contract; tortious interference with contract; breach of fiduciary duty; and (for Mesa only) fraudulent inducement to purchase certain airplanes and to extend its contract with United. The district court concluded that all but the first was preempted, and we affirmed. Even though the theories presented in the last three counts relied on laws that are not targeted at air transportation, more is needed to avoid preemption.

On appeal, we considered and rejected an analogy to the preemption rules that apply for the Employment Retirement Income Security Act ("ERISA"), under which only state laws that "relate to" the statutory subject matter are preempted. Thus, the Supreme Court has held, in ERISA cases "state laws of general applicability are not preempted just because they have economic effects on pension or welfare plans." 219 F.3d at 608. Even if this line of reasoning might seem sensible for the ADA (and the FAAAA), we said, the Supreme Court has not extended its ERISA rulings to the transportation statutes. Unless and until it does, we are bound to follow the existing decisions.

In that spirit, we followed our earlier decision in *Travel All Over the World, Inc. v. Saudi Arabia,* 73 F.3d 1423 (7th Cir. 1996), which held that "*Morales* and *Wolens* allow us to discern two distinct requirements for a law to be expressly preempted by the ADA: (1) A state must "enact or enforce" a law that (2) "relates to" airline rates, routes, or services, *either* [a] by expressly referring to them *or* [b] by having a significant economic effect upon them." *Id.* at 1432 (emphasis and subheadings added). Only the first claim for breach of contract was limited to an effort to enforce the parties' bargain; each of the other three represented an effort to change the parties' financial arrangements with respect to the provision of air services, including route assignments and flight frequency. Even if the laws the plaintiffs cited do not relate directly to airlines, as applied in the case they had a significant economic effect on the very areas protected by the ADA. Preemption therefore followed.

*Data Manufacturing, Inc. v. United Parcel Service, Inc.,* 557 F.3d 849 (8th Cir. 2009), concerned a suit brought by Data Manufacturing (DMI) against United Parcel Service; DMI alleged that certain billing practices of UPS amounted to a breach of contract, fraudulent and negligent misrepresentation, and a type of tortious conversion. Once the case was removed to federal court, UPS argued that DMI's claims were all preempted by the FAAAA. Following a theme that is becoming familiar, the Eighth Circuit ruled that DMI could proceed with its contract claim, but that all the rest fell as a result of the FAAAA's preemption rule. The underlying dispute was fairly straightforward. For some time DMI had been

required by its customer, First Data, to use UPS as the shipper for gift cards that DMI manufactured for First Data. Typically UPS would bill DMI for the shipments, and First Data would reimburse DMI for those charges. At some point, however, DMI itself began to ship the cards using First Data's account to pay UPS. First Data rejected some of those billings. This meant that UPS had to charge DMI for the rejected billing; for its trouble, UPS added a $10 charge to DMI's account for each re-billing. The re-billing charges were substantial: they actually exceeded the total cost of the shipments for a 17-month period.

The Eighth Circuit had no trouble concluding that the contested $10 re-billing charge related to both price and services. DMI tried to argue that there was no real service provided, but as the court said, "[c]ertainly shipping is the main component of UPS's business and service, but it is disingenuous to suggest that UPS's billing procedures are not a necessary component of its business operations." 557 F.3d at 852. Furthermore, the claims (other than the contract claim) depended on Missouri state law. Preemption followed directly from the holdings of *Wolens* and *Morales.*

In *Onoh v. Northwest Airlines, Inc.*, 613 F.3d 596 (5th Cir. 2010), the Fifth Circuit took matters one step further by finding preemption of both a claim for intentional infliction of emotional distress and a claim for breach of contract. Onoh, a Nigerian national and diplomat, had purchased an airline ticket to travel from Nigeria to Dallas by way of Amsterdam. The Netherlands

requires certain air passengers to obtain an airport transit visa, and it holds carriers responsible for verifying that passengers have the correct travel documents. When Onoh tried to check in at the Dallas-Fort Worth International Airport, the gate agent informed her that her visa was expiring too soon and that she needed a new transit visa in order to pass through Amsterdam. Northwest Airlines refused to allow her to board, even when she displayed her diplomatic passport, and she was delayed for several days until she secured a proper transit visa. She sued Northwest for discrimination in violation of federal law and for breach of contract and IIED under state law.

The court quickly affirmed the dismissal of the emotional distress claim, holding that the airline's decision whether to permit a passenger to board the plane falls squarely within the ambit of "services." It rejected Onoh's effort to distinguish between the provision of the service and the manner in which she was refused service. Turning to the contract claim, the court conceded that these are normally outside the ADA's preemption section. But, it reasoned, the rationale of *Morales* and *Wolens* rests on the distinction between self-imposed undertakings and those imposed by law (other than federal law). In this case, it found that the airport transit visa requirement, while reflected in the contract of carriage, was not Northwest's self-imposed restriction. It derived instead from international travel regulations imposed by the Netherlands, which is a party to the Schengen Agreements. Her claim thus fell outside the contract rule recognized in *Morales* and *Wolens* and was preempted.

Finally, there is the interesting matter of state antitrust law. In *In re Korean Air Lines Co., Ltd. Antitrust Litigation,* 642 F.3d 685 (9th Cir. 2011), the Ninth Circuit had before it a case in which a plaintiff class wanted to assert antitrust claims against Korean Air Lines and Asiana Air Lines. Specifically, the plaintiffs alleged that the fares they paid for tickets were too high, as a result of a conspiracy between competitors, and that this violated both state antitrust and consumer protection laws. The district court carved off the direct purchaser plaintiffs for separate treatment. Thus the case before the Ninth Circuit involved only the indirect purchasers, who could not bring a federal antitrust claim because of the rule of *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977). For this group of plaintiffs, the court of appeals concluded that the ADA preemption clause operated to bar all of the state claims. The allegations that the defendant airlines engaged in price-fixing in violation of California law were "related to a price" of an air carrier: both the state antitrust law and the consumer protection law seek to regulate the manner by which the defendants set fares for air transportation services. And it is not too much of a stretch to conclude that "price-fixing" relates to price.

The court found it "immaterial that the state laws do not interfere with the purposes of the federal statute or that they might be consistent with promoting competition and deregulation." 642 F.3d at 697. *Morales*, reinforced by *Rowe*, forecloses that argument. As this court had done earlier, the Ninth Circuit also refused to follow the ERISA cases' treatment of preemption—an argument that *Rowe* should have put to rest in any event. *Id.*

b

As we already have noted, and as the Supreme Court has foreseen, not every case involving either the ADA or the FAAAA has concluded with a finding of preemption. Once again, we look at a number of illustrative examples for the purpose of shedding light on the type of claim that belongs on the "no preemption" side of the line.

In 1995, the *en banc* Fifth Circuit decided a pair of such cases: *Hodges v. Delta Airlines, Inc.,* 44 F.3d 334 (5th Cir. 1995), and *Smith v. America West Airlines, Inc.,* 44 F.3d 344 (5th Cir. 1995). In *Hodges,* the plaintiff was injured during a flight from the Caribbean to Miami when a fellow passenger opened an overhead compartment and dislodged a box containing several bottles of rum. The box tumbled down and cut her arm and wrist. The court concluded that the plaintiff's state-law tort claim against the airline for alleged negligent operation was not preempted by the ADA. In so doing, it relied on *Morales*'s reservation of state actions that affect airline services in "too tenuous, remote or peripheral a manner." 44 F.3d at 336. Looking at the definition of "services" in both *Morales* and *Wolens,* the court drew a line between matters such as access to flights, class-of-service upgrades, and rates, on the one hand, and personal physical injuries or property damage caused by the operation and maintenance of aircraft, on the other. *Id.* The court also found it telling that the airline deregulation legislation actually requires airlines to maintain either insurance or self-insurance as prescribed by the

Federal Aviation Administration that covers liability for bodily injuries or property damage. *Id.* at 338. As the court said, "neither the ADA nor its legislative history indicates that Congress intended to displace the application of state tort law to personal physical injury inflicted by airline operations, or that Congress even considered such preemption." *Id.* Finally, the court acknowledged that the general survival of state tort claims does not extend to every conceivable tort; it gave as examples of claims that are preempted one for wrongful eviction from a flight, and one for wrongful bumping from an overbooked flight.

*Smith*, decided on the same day, applied these principles to a claim brought by passengers on an America West flight from Houston to Las Vegas against the airline for negligence and gross negligence relating to its alleged failure to prevent a would-be hijacker from boarding the airplane as a passenger. (The hijacker was eventually thwarted in his effort to compel the pilot to fly the plane to Cuba.) The court concluded that the plaintiffs' claims, which generally accused the airline of failure to warn or protect the ticketed passengers against known hazards, did not relate to "services" as that term is used in the ADA. It commented that the Supreme Court has counseled courts not to find preemption lightly, 44 F.3d at 346, and with that in mind, it interpreted "service" to be "limited to economic decisions concerning boarding, *e.g.,* overbooking or charter arrangements, and contractual decisions whether to board particular ticketed passengers." *Id.* It concluded with this statement:

If appellants ultimately recover damages, the judgment could affect the airline's ticket selling, training or security practices, but it would not regulate the economic or contractual aspects of boarding. Any such effect would be "too tenuous, remote or peripheral" to be preempted by § 1305(a)(1).

44 F.3d at 347.

*Travel All Over the World, supra,* is particularly helpful, since it involved both claims that were preempted (as we noted earlier, those for tortious interference with contract, intentional infliction of emotional distress, and fraud) and claims that were not. In addition to breach of contract claims that were plainly available under *Morales* and *Wolens*, the plaintiffs in *Travel All Over the World* presented claims alleging that the defendants had defamed them by telling their clients that *Travel* was not a reputable travel agency and that it had lied to its clients in a number of respects. We concluded that although the slander and defamation claims referred to *Travel*'s services, they did not relate at all to the services of the defendant airline. 73 F.3d at 433. Indeed, we said, the statements themselves were not "services" at all, in the sense of a bargained-for or anticipated provision of labor from one party to another. *Id.* Nor did these claims have the forbidden effect on rates, routes, or services. We therefore held that these claims were not preempted.

Last, we note that in *ATA Airlines, Inc. v. Federal Express Corp.,* 665 F.3d 882 (7th Cir. 2011), we held that a promissory estoppel claim is sufficiently like a contract claim

to escape preemption under the ADA. We explained that ruling as follows:

> Promissory estoppel, as the word "promissory" implies, furnishes a ground for enforcing a promise made by a private party, rather than for implementing a state's regulatory policies. A garden-variety claim of promissory estoppel—one that differs from a conventional breach of contract claim only in basing the enforceability of the defendant's promise on reliance rather than on consideration, *In re Fort Wayne Telsat, Inc.*, 665 F.3d 816, 819 (7th Cir. 2011); *Garwood Packaging, Inc. v. Allen & Co.*, 378 F.3d 698, 701-02 (7th Cir. 2004)—is therefore not preempted.

665 F.3d at 884.

## C

### 1

With this background in place, we can be brief in our summary of the arguments the parties have presented. S.C. Johnson urges that its tort claims seek civil damages for the Carriers' alleged criminal conduct: bribery, conspiracy, fraud, and racketeering. Although this criminal scheme naturally affected the rates that S.C. Johnson paid for transportation services, the underlying laws prohibiting bribery and racketeering have only a tangential effect on prevailing rates. Indeed, S.C. Johnson says, from an economic point of view the laws prohibiting bribery and other forms of corruption actually foster the free market that the FAAAA was intended

to create; they do not hinder it. Upping the ante, S.C. Johnson suggests that if its effort to recover for bribery and racketeering in this case is found to be preempted, then the State of Wisconsin by the same logic would be unable to bring criminal prosecutions for the same bribery and racketeering if it occurs in the transportation sector.

For their part, the Carriers argue that preemption is "clear." All of S.C. Johnson's allegations, they claim, boil down to complaints that S.C. Johnson paid too much for its transportation services. That is a classic argument about rates and service, and they see no reason why it should not be preempted. With embellishments that we do not need to rehearse, the Carriers attribute to S.C. Johnson the argument that "ordinary" torts will be preempted but that really bad ("Machiavellian") claims related to criminal statutes are not. Having set up that construct, the Carriers dismiss it as both waived and meritless. They also argue that FAAAA preemption must be decided on a claim by claim basis.

2

We see no need to discuss the more extreme arguments that either side has made here. Instead, we confine ourselves to the straightforward job at hand: deciding on which side of the line established in *Morales, Wolens,* and *Rowe* we should place each of S.C. Johnson's theories. As the Carriers correctly note, this is a task that requires us to focus on each individual claim. We discuss everything but count 5 below. Because S.C. Johnson has not

challenged the district court's alternate holding that
count 5 was time-barred, we save for another day the
question whether the theory of aiding and abetting a
breach of fiduciary duty by providing bribes and kick-
backs is preempted.

a

Two of S.C. Johnson's theories, in our view, relate
sufficiently to rates, routes, or services, that they must
be rejected as a matter of law under the FAAAA preemp-
tion rule. These are count 1, for fraudulent misrepre-
sentation by omission, and count 3, for conspiracy to
commit fraud. Each of these claims seeks to substitute
a state policy (embodied in law) for the agreements
that the parties had reached. Over strong arguments
questioning why a free market would ever need to
tolerate deceptive, fraudulent, or other offensive agree-
ments, the Supreme Court in *Morales* held that the
NAAG Air Travel Guidelines were nonetheless pre-
empted. 504 U.S. at 388-90; see also *Mesa Airlines*, 219
F.3d at 610. In the air sector, the Department of Trans-
portation remains available to address any problems of
this ilk that may exist. And one state's deceptive practice
might be another state's hard bargain. See Chad DeVeaux,
*Lost in the Dismal Swamp: Interstate Class Actions, False
Federalism, and the Dormant Commerce Clause*, 79 GEO.
WASH. L.R. 995, 1021 (2011) (state consumer protection
laws "vary substantially, imposing myriad 'different . . .
substantive elements, including differing requirements
of privity, demand, scienter and reliance'" (quoting

*Kaczmarek v. IBM Corp.*, 186 F.R.D. 307, 312 (S.D.N.Y. 1999))); Edward M. Crane, *et al.*, *U.S. Consumer Protection Law: A Federalist Patchwork*, 78 DEF. COUNS. J. 305, 305-06 (2011) ("While every state has enacted laws prohibiting unfair or deceptive business practices, the scope, evolution, and enforcement of those laws vary considerably from state to state."). State consumer protection laws often contain well-meaning but widely varying paternalistic provisions designed to protect consumers from the rigors of the market. Congress decided, however, in both the ADA and the FAAAA that it did not want (nor did it want the states) to displace the market in this way. *Cf. Statland v. American Airlines*, 998 F.2d 539, 542 (7th Cir. 1993).

b

S.C. Johnson's remaining two theories assert that the Carriers engaged in a criminal conspiracy to violate Wisconsin's bribery statute, WIS. STAT. § 134.05, and that they violated Wisconsin's state equivalent to the federal racketeering statute, WIS. STAT. § 946.80. These require a closer look.

We can begin by ruling out some possibilities that have led to a finding of preemption in other cases. Neither the bribery statute underlying the conspiracy theory nor the racketeering statute provides non-bargained alternatives to the contractual terms that the parties selected. These theories are thus not like the ones we rejected in *Mesa Airlines,* where we recognized that the plaintiffs' theories of tortious interference with contract,

breach of fiduciary duty, and fraudulent inducement to enter a contract were, in the final analysis, simply efforts to change the bargain that the parties had reached. We have here state laws of general application that provide the backdrop for private ordering; it is not necessary or even helpful to lard a contract with clause after clause promising not to violate such laws, whether those laws are the anti-gambling laws to which the Supreme Court referred in *Morales* or they are minimum wage laws, safety regulations (as recognized in *Rowe*), zoning laws, laws prohibiting theft and embezzlement, or laws prohibiting bribery or racketeering. As *Rowe* put it, these are state regulations "that broadly prohibit[] certain forms of conduct" and that affect transportation companies (whether air or surface carriers) only in their capacity as members of the public. 552 U.S. at 375.

Another way to look at this problem is to consider the production function that drives market transactions in the transportation industry. This function, which describes "the technical relationship between product output and the input of factors of production," see Production Function, MERRIAM WEBSTER ONLINE, http://www.merriam-webster.com/dictionary/production%20function, typically includes inputs such as labor, capital, and technology. These inputs are often the subject of a particular body of law. For example, labor inputs are affected by a network of labor laws, including minimum wage laws, worker-safety laws, anti-discrimination laws, and pension regulations. Capital is regulated by banking laws, securities rules, and tax laws, among others. Technology is heavily influenced by intellectual property laws. Changes

to these background laws will ultimately affect the costs of these inputs, and thus, in turn, the "price . . . or service" of the outputs. Yet no one thinks that the ADA or the FAAAA preempts these and the many comparable state laws, see, *e.g., Californians For Safe & Competitive Dump Truck Transp. v. Mendonca,* 152 F.3d 1184, 1189 (9th Cir. 1998) (minimum wage laws not preempted), because their effect on price is too "remote." *Morales,* 504 U.S. at 390. Instead, laws that regulate these inputs operate one or more steps away from the moment at which the firm offers its customer a service for a particular price. The laws prohibiting bribery, racketeering, embezzlement, industrial espionage, and gambling similarly set basic rules for a civil society, rather than particular terms of trade between parties to a transaction.

But, one might think, the particular bribery and racketeering violations that S.C. Johnson has alleged here come much closer to the point of contact between the carrier and the customer. S.C. Johnson says that the bribes had the effect of increasing the prices that it paid for transportation under some contracts and that the illegal activity affected its choice of contracting partners. That may be true, but as we have just said, an effect on price may be necessary for preemption, but it is not sufficient. In our view, the enforcement of anti-bribery (and more generally anti-corruption) laws is too tenuously related to the regulation of the rates, routes, and services in the trucking industry to fall within the FAAAA's preemption rule. It is important in this connection to consider whether enforcement of a state law has a generalized effect on transactions in the economy

as a whole, or if it affects only particular arrangements (just as a firm with an embezzling employee might have higher costs for a time while it recovered from the thefts). *Morales* and especially *Wolens* took this perspective insofar as they stressed that the broad applicability of the preemption statutes should be understood in light of their deregulatory purpose. *Wolens*, 513 U.S. at 230; *Morales*, 504 U.S. at 390; *cf.* Stephen Breyer, *Reforming Regulation*, 59 TUL. L. REV. 4, 14-16 (1984) (discussing airline deregulation and emphasizing market-wide benefits over individual losses).

Consumer fraud laws, which are preempted, necessarily have an industry-wide effect on prices and services, since they dictate the rules for price advertising and other marketing practices. *Morales*, 504 U.S. at 389-90. The amount (if any) of necessary regulation is hotly debated (thus, the wide variance in these laws from state to state). Compare *id.* with *California Dental Ass'n*, 526 U.S. at 777-78 and *Morales*, 504 U.S. at 423-24 (Stevens, J., dissenting). Bribery laws are different: When they are enforced, market pricing mechanisms work more efficiently—not less. Susan Rose-Ackerman, *The Political Economy of Corruption*, *in* CORRUPTION AND THE GLOBAL ECONOMY (Kimberly Ann Elliott, ed. 1997) 31, 42; see also Timothy L. Fort & James J. Noone, *Gifts, Bribes, and Exchange: Relationships in Non-Market Economies and Lessons for Pax E-Commercia*, 33 CORNELL INT'L L. J. 515, 518 (2000). The proper operation of private law preventing such corruption is especially important in deregulated spaces. Fort & Noone, *supra*, at 518. From an economic standpoint, bribery operates as a privately-imposed transaction

cost on the affected sale—similar, in many ways, to a "swipe fee" for credit card transactions or even a sales tax, both of which are susceptible to regulation by state governments. See, *e.g.*, N.H. H.B. 1319, 2012 Sess. ("An Act Limiting Credit Card Interchange Fees Charged to Merchants."). State regulation of bribery is an attempt to lift this "tax" from the shoulders of its consumers: Just as these laws are not preempted by the ADA or the FAAAA; see *DiFiore v. American Airlines, Inc.*, 646 F.3d 81, 87 (1st Cir. 2011) (stating "view that the Supreme Court would be unlikely—with some possible qualifications—to free airlines from most conventional common law claims for tort, from prevailing wage laws, and ordinary taxes applicable to other businesses" while holding a service charge law related to the price of curbside baggage service preempted), anti-bribery laws that have a similar effect should also be able to operate.

Last, we address the fact that the injury that S.C. Johnson alleges that it suffered as a result of the alleged conspiracy to bribe its dishonest employee and as a result of the racketeering activity bears some relation to the price that it paid for transportation services and the companies with which it contracted for those services. The Carriers argue that this is the smoking gun that proves that S.C. Johnson's claims are "really" just about rates and services. We see things differently.

We address the bribery count first. As we already have discussed, Wisconsin's law forbidding bribery (and related offenses such as conspiracy or attempt to bribe) should not be characterized for FAAAA purposes in

the same way as a consumer fraud and deceptive prac-
tices law (which imposes non-waivable state-ordered
provisions in contracts that displace private arrange-
ments) or an antitrust law (which forbids price-fixing or
its equivalents). It is not at all inevitable that the
damages that S.C. Johnson suffered as a result of Morris's
dishonesty will move in lockstep with the amount of the
bribes that he took. The precise value of the travel ex-
penses, illicit excursions, and the cash bribes that Morris
pocketed, for instance, need not have had any effect on
the actual prices S.C. Johnson paid to its carriers. *Cf.*
U.S.S.G. § 2C1.1, app. note 3 (treating the "value of the
benefit received [as] the same regardless of the value of
the bribe"). Had Morris stolen from S.C. Johnson, or had
he surreptitiously used part of the chosen carrier's
capacity to transport illegal drugs, or had he committed
any number of other crimes, S.C. Johnson would also
have been injured, and its injuries would ultimately
have had a tangential effect on its costs. These, however,
are the kinds of offenses that the Supreme Court has
already said fall on the "non-preemption" side of the line.
We thus conclude that S.C. Johnson's second claim,
charging a conspiracy to violate the bribery statute,
is not preempted by the FAAAA.

Although the racketeering claim presents a closer
case, we conclude that it too may go forward. This
count asserts that each bribe paid by the Carriers and
received by Morris constituted "racketeering activity"
within the meaning of WOCCA, WIS. STAT. § 946.80, and
each fraudulent invoice submitted by the Carriers consti-
tuted either mail fraud under WIS. STAT. § 943.89 or

wire fraud under WIS. STAT. § 943.90, and thus also amounted to "racketeering activity" under WOCCA. To the extent the racketeering charge relies on a bribery theory, what we already have said about bribery is enough to show why any relation to rates, routes, or services is tangential enough to survive preemption. A closer look at the mail and wire fraud offenses in Wisconsin is helpful for the analysis of the additional predicate offenses S.C. Johnson has alleged.

Wisconsin's mail fraud statute provides that "[w]hoever does any of the following [acts of using the mail] to further commission of a financial crime or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, furnish, or procure for an unlawful purpose any counterfeit currency, obligation, or security is guilty of a Class H felony." The term "financial crime" is defined as "a crime under §§ 943.81 to 943.90 or any other felony committed against a financial institution or an attempt or conspiracy to commit one of those crimes." WIS. STAT. § 943.80(1). Many of the crimes in the sections mentioned are specific to financial institutions (see §§ 943.81 to 943.83, 943.85 to 943.87). The focus of § 943.89 and § 943.90, respectively the mail and wire fraud statutes, appears to be the harm done to the intermediary financial institution. Interestingly, the wire fraud statute is entitled "Wire fraud against a financial institution," but it provides that "[w]hoever transmits or causes to be transmitted electrically, electromagnetically, or by light any signal, writing, image, sound, or data for the purpose of committing a financial crime is guilty of a Class H felony." WIS. STAT. § 943.90. If that is the case,

then whatever other problems S.C. Johnson may have with this part of its racketeering theory, preemption is not one of them. Once we take into account the conduct targeted by the wire and mail fraud predicate offenses, it becomes clear that they too relate at most tangentially to rates, routes, and services. (It may be that the mail and wire fraud predicate offenses that S.C. Johnson has asserted are a poor fit for the underlying facts, but we hasten to say that we are not making any such holding, because this is an early stage of the case and there is no telling what it may be able to develop during discovery.) If S.C. Johnson prevails on these claims, there will be time then for the district court to consider whether the proper measure of damages should be tied in any way to alleged overpayments, how to evaluate allegations that Company A received a contract that Company B otherwise would have been awarded, or any other issues related to remedy.

### III

We conclude that although the district court correctly found that S.C. Johnson's claims asserting fraudulent misrepresentation by omission and conspiracy to commit fraud were preempted by the FAAAA, it erred with respect to the bribery and racketeering claims. We therefore REVERSE the judgment and REMAND for further proceedings consistent with this opinion.