In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1110

United Airlines, Inc.,

Plaintiff, Counterdefendant-Appellee,

v.

Mesa Airlines, Inc., and
WestAir Commuter Airlines, Inc.,

Defendants, Counterplaintiffs-Appellants,

v.

SkyWest Airlines, Inc.,

Third-Party Defendant-Appellee.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 4455--Elaine E. Bucklo, Judge.


Argued May 10, 2000--Decided July 5, 2000


Before Easterbrook, Ripple, and Rovner, Circuit
Judges.

Easterbrook, Circuit Judge.  Like other major air
carriers, United has entered into code-sharing
agreements with regional airlines, which fly
smaller planes for shorter distances to less-
populated destinations. The major carrier permits
the commuter carrier to use its service marks and
logos for flights to and from its hub airports,
and it lists the connecting flights in its
computer reservation system under its name,
carrier code, and flight numbers, such as "UA
2345" (hence the term "code-share," see 14 C.F.R.
sec.257(c)). The commuter carrier also receives
part of the revenue from through traffic that
uses both carriers' facilities. In exchange, the
commuter carrier is subject to substantial
direction: it tailors its schedules so that they
mesh with the major carrier's arrivals and
departures at the hub, provides planes
appropriate to the traffic generated by the major
carrier, and agrees to accept revenue that the
major carrier controls. (Contracts set the
percentage of through rates that the commuter

carrier receives, but the major carrier sets the total fares, and thus determines the commuter carriers' revenues.) Major carriers could use their discretion to make commuter carriers' operations unprofitable, but that would hurt the majors' business by drying up local service and driving passengers to other carriers that provide better connecting flights. Market forces thus constrain the exercise of contractual powers.

Mesa Airlines and WestAir Commuter Airlines, two regional airlines that had code-share arrangements with United, believe that courts as well as markets should constrain the major carriers' conduct. Mesa conducted regional operations to and from Denver, and WestAir to and from Los Angeles, San Francisco, Portland, and Seattle. Mesa acquired WestAir as a subsidiary in 1992. In 1995 United extended Mesa's contractual term for ten years and to additional cities; at the same time, Mesa purchased a number of planes from United. Mesa believes that by paying (in its view, overpaying) for these aircraft it acquired rights beyond those of other commuter carriers; it contends that United became its "partner" rather than simply the opposite party to an arms'-length contract. Relations soured in June 1997 when United replaced WestAir with SkyWest Airlines on eight routes out of Los Angeles. After WestAir protested, United filed this suit under the diversity jurisdiction seeking a declaratory judgment that the WestAir-United contract permitted United to make these changes. WestAir abandoned its remaining commuter routes in May 1998. Meanwhile Mesa and United reached impasse on financial arrangements at Denver. Mesa contended that United was keeping for itself too much of the revenues on through routes and charging excessively for space and baggage-handling services at Denver International Airport, which opened early in 1995. Mesa contends that it began to incur losses of $1 million per month, to which it responded by eliminating service to some local markets. United insisted that Mesa serve all regional markets to which it had exclusive rights under the extended agreement; after Mesa refused, United terminated the agreement in January 1998 and amended its suit by seeking a declaratory judgment that this step, too, was proper, and damages for Mesa's breach.

Mesa and WestAir filed counterclaims against United and added SkyWest as a third-party defendant. They seek damages on four theories. First, Mesa and WestAir contend that United broke its contracts; these claims are mirror images of United's. Second, Mesa and WestAir contend that SkyWest is liable for tortiously interfering with the contract between United and WestAir at Los

Angeles. They contend that SkyWest inveigled United to switch regional carriers by offering two gates at Los Angeles International Airport-- gates that United coveted, an offer that WestAir could not match. Third, Mesa and WestAir allege that United violated the fiduciary duties that it owed them as their partner. Fourth, Mesa contends that United fraudulently induced it to purchase the airplanes and enter into the extension. Claims 2, 3, and 4 seek punitive as well as compensatory damages. United and SkyWest prevailed on the pleadings after the district court concluded that these three claims are preempted by sec.105(a)(1) of the Airline Deregulation Act of 1978. As recodified in 1994, this statute reads:

Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. sec.41713(b)(1). State common law counts as an "other provision having the force and effect of law" for purposes of this statute. See American Airlines, Inc. v. Wolens, 513 U.S. 219, 233 n.8 (1995); Morales v. Trans World Airlines, Inc., 504 U.S. 374, 388 (1992). See also Medtronic, Inc. v. Lohr, 518 U.S. 470, 502-03 (1996) (plurality opinion), id. at 503-05 (Breyer, J., concurring), id., at 509-12 (O'Connor, J., concurring in part and dissenting in part) (characterizing tort remedies as regulatory provisions for purposes of preemption clauses in another statute). A broad clause saving common-law remedies might overcome the understanding that judgments in tort suits should be treated like state laws and regulations to the extent they have the same practical effect as laws and regulations, see Geier v. American Honda Motor Co., 120 S. Ct. 1913, 1918 (2000); cf. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 249-56 (1984); but the savings clause in the Airline Deregulation Act says only that "[a] remedy under this part is in addition to any other remedies provided by law." 49 U.S.C. sec.40120(c). This does not carve any domain from the scope of sec.105(a)(1). The district court concluded that all three tort claims relate to an air carrier's routes--they concern which carriers fly to which destinations from which airports, and which carriers provide service (and at what rates) on through or joint routes--and therefore are preempted. See Travel All Over the World, Inc. v. Saudi Arabia, 73 F.3d 1423, 1430-35 (7th Cir. 1996). The district judge certified the order for

interlocutory appeal under 28 U.S.C. sec.1292(b). We agreed to hear the appeal; proceedings on both sides' contract claims (which under Wolens are not preempted) have stalled pending its resolution.

One line of argument might have been that although the claims at issue may be "related to a . . . route . . . of an air carrier" in interstate commerce, Mesa and WestAir do not rely on any "law, regulation, or other provision having the force and effect of law related to a . . . route . . . of an air carrier" (emphasis added). Section 105(a)(1) might have been read to limit preemption to a law, regulation, or common-law doctrine directed to the air transportation industry, as in Morales, which held that sec.105(a)(1) precludes efforts by state attorneys general to promulgate a special code of conduct for advertisements by air carriers. On this understanding, laws of general applicability would not be preempted just because the subject of a particular case was air transportation. Tort law is not industry-specific; Mesa and WestAir want to use the same principles that apply to disputes about computer software, see J.D. Edwards & Co. v. Podany, 168 F.3d 1020 (7th Cir. 1999) (Illinois law), and employment, see Farr v. Gruber, 950 F.2d 399 (7th Cir. 1991) (Wisconsin law). Wolens read sec.105(a)(1) more broadly, however. Participants in a carrier's frequent flyer program filed suit when the carrier changed the program's rules. One claim arose under a state's consumer fraud act, a statute of general applicability. Nonetheless, the Court held, sec.105(a)(1) preempts application of that law to frequent flyer programs, which affect rates because they are discounts. 513 U.S. at 226-28.

Because Wolens held general consumer-fraud law preempted, Mesa and WestAir have a big problem. One solution, as they see it, lies in recent decisions under ERISA, which preempts state laws that "relate to" its subject. Both Morales and Wolens relied on doctrine developed under ERISA, and at the time the Court's opinions tended to read the ERISA language broadly. E.g., Morales, 504 U.S. at 383-84, relying on Shaw v. Delta Air Lines, Inc., 463 U.S. 85 (1983). Times have changed for pension and welfare plans. More recent decisions hold that state laws of general applicability are not preempted just because they have economic effects on pension or welfare plans. See, e.g., New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co., 514 U.S. 645 (1995); California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc., 519 U.S. 316 (1997); De Buono v. NYSA-ILA Medical and Clinical Services Fund, 520 U.S. 806 (1997). Mesa and

WestAir ask us to follow this approach and curtail the preemptive effect of sec.105(a)(1) accordingly. But if developments in pension law have undercut holdings in air-transportation law, it is for the Supreme Court itself to make the adjustment. Our marching orders are clear: follow decisions until the Supreme Court overrules them. State Oil Co. v. Khan, 522 U.S. 3, 20 (1997); Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989).

Opinions such as Taj Mahal Travel, Inc. v. Delta Airlines Inc., 164 F.3d 186, 195 (3d Cir. 1998), which say that state law is preempted by sec.105(a)(1) only if it "frustrate[s] Congressional intent [or] impose[s] a state utility-like regulation on the airlines", cannot be reconciled with Wolens (the general anti-fraud statute held preempted there was a long distance from "utility-like regulation"), and we doubt that this position could be justified by the latest ERISA cases, even if we were free (which we are not) to prefer decisions such as De Buono and Dillingham over Wolens and Morales. One subject of UNUM Life Insurance Co. v. Ward, 526 U.S. 358 (1999), the Court's most recent encounter with preemption under ERISA, was whether a general doctrine of state agency law could be used to override the express terms of a welfare-benefit plan. The Court answered "no," see 526 U.S. at 377-79, and this conclusion, like Wolens, necessarily means that a claim under, or application of, state law may be preempted as related to the federal topic, even though the rule in question does not single out pension or welfare plans--or air carriers' rates, routes, or services. Our opinion in Travel All Over the World used the approach established by Wolens and Morales, concluding that a claim is preempted if either the state rule expressly refers to air carriers' rates, routes, or services, or application of the state's rule would have "a significant economic effect upon them" (73 F.3d at 1432); nothing any other circuit has said about the subject persuades us to alter course.

The possibility that recent ERISA decisions would lead us to abandon Travel All Over the World and follow Taj Mahal Travel (which declined to follow this circuit's position, see 164 F.3d at 193-95) is what induced the district court to certify its order for interlocutory appeal. But an appeal under sec.1292(b) brings up the whole certified order, Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 204-05 (1996); Edwardsville National Bank & Trust Co. v. Marion Laboratories, Inc., 808 F.2d 648, 650-51 (7th Cir. 1987), rather than just the legal issue that led to certification. Thus we must tackle the regional carriers' contention that their claims are sound, despite Travel All

Over the World, for the same reason the Supreme Court held in Wolens that contract claims are not preempted: sec.105(a)(1) is designed to replace regulation with voluntary agreements, see 513 U.S. at 228-35, and the fact that states sometimes apply the label "tort" to common-law doctrines that implement private agreements cannot doom their claims, the carriers insist. This is unimpeachable as a principle, but does it save these carriers' claims? Wolens tells us to distinguish

between what the State dictates and what the airline itself undertakes[, which] confines courts . . . to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement.

513 U.S. at 233 (footnote omitted). It is awfully hard to understand the regional carriers' claims as efforts to enforce "the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement."

Let us start with Mesa's contention that its purchase of aircraft, and the extension of its code-sharing agreement with United at Denver, are the result of fraudulent inducement. This is not by any stretch of the imagination a request to enforce the parties' bargains; it is a plea for the court to replace those bargains with something else. Doubtless the institution of contract depends on truthfulness; the staunchest defenders of private institutions and limited government believe that public bodies must enforce rules against force and fraud. E.g., Richard A. Epstein, Principles for a Free Society 82-85 (1998). When all a state does is use these rules to determine whether agreement was reached, or whether instead one party acted under duress, it transgresses no federal rule. But when the state begins to change the parties' financial arrangements, as Mesa demands, it is supplying external norms, a process that the national government has reserved to itself in the air transportation business. Mesa does not want to cancel the agreement and restore the status quo as of 1994. It wants damages. Wolens held that sec.105(a)(1) preempts state anti-fraud statutes as applied to air carriers' rates, routes, and services, 513 U.S. at 227-28; just so with common-law rules against fraudulent inducement, which differs from a contention that one party knuckled under to a show of force by the other. And as in Wolens this conclusion does not leave regional air carriers at the mercy of unscrupulous major carriers (or the reverse); the Secretary of Transportation has been charged with investigating claims of deceit in the air transportation business and has the power to

issue remedial orders (including monetary penalties) against air carriers that resort to fraudulent practices. 49 U.S.C. sec.sec. 41712, 46301; Wolens, 513 U.S. at 228 n.4; Morales, 504 U.S. at 379, 390-91.

   Next consider the contention of both Mesa and WestAir that fiduciary principles drawn from partnership law should be applied. Partnership is contractual; partners can and do specify their relations in detail, and the norms of partnership law are just background rules that cover a subject when contracts do not. In this sense partnership and fiduciary rules are a part of contract law, cf. John H. Langbein, The Contractarian Basis of the Law of Trusts, 105 Yale L.J. 625 (1995). But Mesa and WestAir assert that the law of partnerships imposes on United duties that override the contract. For example, United contends that its contracts permit it to regulate the destinations and flight frequency of the code-share regional carriers; Mesa and WestAir deny this, and if they are right then they will prevail under their contracts. But they contend (under their partnership theory) that they prevail even if United had the contractual power to do what it did. According to Mesa and WestAir, United had a fiduciary obligation to use its contractual powers for their economic benefit, rather than for its own, and that they are entitled to punitive damages because (in the language of their brief) United attempted "to terminate Mesa's rights and interests in the Partner Agreement for its own benefit and to Mesa's detriment". Illinois permits one party to a contract to use for its own benefit the rights and powers it has negotiated. See L.A.P.D., Inc. v. General Electric Corp., 132 F.3d 402 (7th Cir. 1997); Echo, Inc. v. Whitson Co., 121 F.3d 1099 (7th Cir. 1997); Digital Equipment Corp. v. Uniq Digital Technologies, Inc., 73 F.3d 756 (7th Cir. 1996); Industrial Representatives, Inc. v. CP Clare Corp., 74 F.3d 128 (7th Cir. 1996); Continental Bank, N.A. v. Everett, 964 F.2d 701 (7th Cir. 1992); Jespersen v. Minnesota Mining & Mfg. Co., 183 Ill. 2d 290, 700 N.E.2d 1014 (1998); Hentze v. Unverfehrt, 237 Ill. App. 3d 606, 610-11, 604 N.E.2d 536, 539 (5th Dist. 1992). Only rules external to the parties' bargain could defeat this, but sec.105(a)(1) in turn defeats external rules. (We are skeptical that the word "partner" on the cover sheet of a complex contract that characterizes the regional carriers as "independent contractors" would bring the law of partnership into play in the first place. Businesses often refer to suppliers, customers, and producers of complementary products coloquially as "our partners" without summoning up fiduciary duties. See Vaughn v. General Foods Corp., 797 F.2d 1403 (7th Cir.

1986). A consumer who sees the advertising slogan "Partners in Progress" would not assume that he had become a "partner" of the producer, which then must set prices for the consumer's benefit. But we need not pursue this point, given sec.105(a)(1).)

Finally, consider the claim that SkyWest tortiously interfered with the contract WestAir had with United. Here, too, Mesa and WestAir rely on principles outside the parties' agreements-- for they have reached no agreement at all with SkyWest. Why can't SkyWest offer United gates at Los Angeles International Airport in exchange for some code-share business at LAX? That question can't be answered by reference to a contract between SkyWest and any other party to the case. Even the appearance of a link between the claim against SkyWest and the contract claim against United may be illusory, because most states (including Illinois) treat as tortious some interferences with prospective economic advantage, even if the interference does not cause anyone to break a promise. Suppose, for example, that United's contract with WestAir contained a clause entitling United to end the business relation for any or no reason. Then WestAir could not sue United--but it still could prevail in tort against SkyWest, if the sort of inducement SkyWest offered, or the motive for SkyWest's action, ran afoul of a state's public policy. See, e.g., J.D. Edwards, supra; Jeppesen v. Rust, 8 F.3d 1235 (7th Cir. 1993); Poulos v. Lutheran Social Services of Illinois, Inc., 728 N.E.2d 547 (Ill. App. 1st Dist. 2000); Strosberg v. Brauvin Realty Services, Inc., 295 Ill. App. 3d 17, 33, 691 N.E.2d 834, 845 (1st Dist. 1998); Reuben H. Donnelley Corp. v. Brauer, 275 Ill. App. 3d 300, 312-13, 655 N.E.2d 1162, 1172 (1st Dist. 1995). No surprise, then, that courts regularly treat claims of tortious interference with contract (or interference with economic advantage) as preempted in labor law, given how readily these claims may be used to get around contracts (or limits on the means of enforcing contracts). See, e.g., Lingle v. Norge Division of Magic Chef, Inc., 823 F.2d 1031, 1047, 1049 (7th Cir. 1987) (en banc), reversed on other grounds, 486 U.S. 399 (1988); Kimbro v. Pepsico, Inc., No. 99-2823 (7th Cir. June 2, 2000). Likewise they are preempted when they would have a significant effect on air carriers' rates, routes, or services--as these claims, which are all about WestAir's (and SkyWest's) routes and divisions of revenues, assuredly do whether or not they would lead to punitive damages. Cf. Speakers of Sport, Inc. v. ProServ, Inc., 178 F.3d 862 (7th Cir. 1999) (illustrating how the tort of interference with economic advantage may be used to suppress competition, which would

undercut the Airline Deregulation Act of 1978).

Mesa and WestAir protest that none of their claims offends the goals and policies that Congress likely aimed at in 1978. One could have said the same (indeed, Justice Stevens did say the same) about the regulations and statutes held preempted in Morales and Wolens. But Justice Stevens was in dissent; the majority concluded that the statute applies according to its text, rather than according to goals and motives imputed to legislators. For what it may be worth, however, we are inclined to think that allowing these claims to proceed could gum up the works. Mesa offered service to multiple states from Denver, service United used to construct through rates and routes for travel across many jurisdictions. So too for regional service out of Los Angeles, which reached Oregon and Washington, and affected through travel to and from other states and nations. Yet Mesa and WestAir want us to hold that the tort law of Illinois determines (for example) what inducements SkyWest may offer United to reassign routes among regional carriers in the southwest, and how much Mesa should receive for its portion of through rates on service from Miami through Denver to Jackson, Wyoming. Illinois is United's headquarters, and the parties agreed that their contracts would be interpreted under Illinois law, but as a source of tort law Illinois has no plausible claim--and for that matter no other state has much of a claim either. Basic rules for inter-carrier transactions may come from voluntary agreements or from the Department of Transportation; applying the conflicting tort principles of 50 different states to these interstate and international transactions would make a mess of things. Preemption under sec.105(a)(1) enables a system of private law, with nationally uniform overrides, to flourish.

Affirmed