**Opinion issued February 14, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-10-01080-CV

————————————

**DHL EXPRESS (USA), INC., Appellant**

**V.**

**FALCON EXPRESS INTERNATIONAL, INC., Appellee**

---

**On Appeal from the 157th District Court**
**Harris County, Texas**
**Trial Court Case No. 2008-66394**

---

## O P I N I O N

In May 2008, Falcon Express International obtained the rights to buy and resell DHL package delivery services under a DHL Express (USA) Inc. reseller agreement. To obtain those rights, which previously belonged to Freight Savers

Express, Inc., Falcon entered into an Assignment and Assumption Agreement with Freight Savers and DHL, in which Falcon agreed to assume Freight Savers's obligations under the reseller agreement, including Freight Savers's significant outstanding debt to DHL.

Over the next few months, DHL sold its package delivery services to Falcon, which, in turn, resold them to its customers, pursuant to the terms of the reseller agreement. But Falcon fell behind in its payments to DHL and, on that basis, DHL terminated the reseller agreement effective November 7, 2008. Three days later, DHL announced it was discontinuing domestic package delivery services, a large part of Falcon's business.

Falcon sued DHL, seeking rescission of the assumption agreement on the theory that Falcon was induced to enter into the assumption agreement by DHL's deliberately misleading statements that it had "ruled out" a cessation of its U.S. domestic shipping services. DHL countersued for breach of contract, to recover amounts it claimed were due from Falcon under the reselling and assumption agreements. The trial court's judgment awarded Falcon $1.7 million under a rescission theory and $3.2 million in punitive damages based on the jury's finding that DHL committed fraud by failing to disclose to Falcon a material fact—that DHL still was contemplating exiting the domestic package delivery services market—before Falcon entered into the assumption agreement. The trial court's

judgment also recited that DHL shall take nothing on its counterclaim for breach of contract.

DHL appeals, contending, among other things, that Falcon's fraud claim is preempted by the Airline Deregulation Act of 1978 (49 U.S.C. § 41713(b)(1)) and the Federal Aviation Administration Authorization Act (*id.* § 14501(c)(1)), and that factually insufficient evidence supports the jury's finding that $0 would compensate DHL for Falcon's breach of contract. Finding both contentions meritorious, we reverse the trial court's judgment, dismiss Falcon's fraud claim, and remand DHL's counterclaim for breach of contract.

## Background

DHL Express (USA), Inc. is a federally regulated express package delivery company that, in 2008, provided domestic and international package delivery services. While DHL sold its services to larger customers directly, it also sold to resellers, which, in turn, marketed and sold DHL's services to smaller customers. Freight Savers Express, Inc. was one such reseller. It bought and resold DHL's services under the terms of a reseller agreement between Freight Savers and DHL.

In early 2008, DHL had sent Freight Savers notice that it intended to terminate the reseller agreement because Freight Savers had fallen behind in its payments. Three Freight Savers employees, James Fisher, Rick Bouse and David Shavlan, decided to form a new entity, Falcon, and have Falcon take over Freight

3

Savers's business. The men had heard rumors that DHL was contemplating exiting the domestic shipping market due to huge financial losses. But there was also evidence the men knew, before they took over Freight Savers's business, that high-level DHL executives had been quoted as saying that DHL had "ruled out the option of withdrawal," and that DHL "expects to present a plan for the division there in May." Bouse testified that, the day before Falcon entered into the assumption agreement, Bouse contacted Beth Taylor, his main contact at DHL, to ask about the rumors. According to Bouse, Taylor assured Bouse that the plan for reducing the domestic footprint involved no more than a four percent reduction in services and that the reduction would affect only rural areas in the U.S. The next day, May 28, Fisher signed the assumption agreement on behalf of Falcon, assuming Freight Savers's rights and obligations under Freight Savers's reseller agreement with DHL. The assumption agreement reflects that DHL consented to the assignment and agreed to withdraw its notice of material breach and contract termination on the condition that Falcon pay $1,571,426.31 against Freight Savers's past due debt by May 29.

Falcon met that condition and began doing business under the reseller agreement, but soon fell behind on payments due to DHL. Over the next several months, Falcon repeatedly promised to catch up, but it never did. On September 29, 2008, four months after entering into the assumption agreement, Falcon sent

4

the last payment it would make to DHL. On that same day, DHL informed Falcon that DHL would cease domestic shipping "fairly soon." Despite this news, Falcon and DHL continued doing business and discussing Falcon's unpaid invoices. In an October meeting, Falcon disputed some of DHL's charges. Shortly thereafter, Bouse sent DHL an email explaining that Falcon felt it had been defrauded because it paid "an awful lot of money . . . based on [the] belief that DHL would be in business in the United States."

On October 24, 2008, DHL sent Falcon a Default Notice demanding payment of approximately $1.6 million. The following week, DHL sent another notice offering to waive $562,000 of the past due debt in exchange for Falcon's agreement to pay $966,348.49, and enter into "a mutual full release of any existing claims." Falcon did not agree, and DHL terminated the reseller agreement on November 7, 2008. Three days later, DHL announced publicly that it would cease domestic package delivery services.

Falcon sued DHL for fraudulent inducement and fraud, and DHL countersued for breach of contract. After a seven-day trial, the jury found DHL committed "fraud by failure to disclose a material fact prior to [Falcon] entering

5

into the [assumption agreement]"[1] and awarded out-of-pocket damages in the amount of $1.7 million and punitive damages in the amount of $3.2 million. With respect to DHL's counterclaim for breach of contract, the jury found Falcon breached both the assumption and the reseller agreements, and that $0 would fairly and reasonably compensate DHL for its damages. The trial court entered judgment on the jury's verdict, awarding Falcon the sum of $4.9 million[2] and denying DHL relief on its counterclaim for breach of contract. DHL appeals.

### Preemption under the ADA and FAAAA

In its first issue, DHL contends Falcon's claim fraud claim is preempted by the Airline Deregulation Act of 1978 (ADA) and the Federal Aviation Administration Authorization Act (FAAAA). Under the Supremacy Clause, if a state law conflicts with federal law, the state law is preempted and without effect. *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S. Ct. 2114, 2128–29 (1981).

---

[1]    The jury answered "yes" to Question 2, which asked whether DHL committed fraud by non-disclosure, but it answered "no" to Question 1, which asked whether DHL fraudulently induced Falcon to enter into the assumption agreement by making a material misrepresentation. Thus, although we refer throughout this opinion to the claim on which Falcon prevailed as a "fraud" claim, it is, more specifically, a claim of fraud by nondisclosure.

[2]    The exact amount of the judgment, $4,918,953.41, is the sum of $1,704,228.79, which is the amount of out-of-pocket damages found by the jury in response to Question 3, and the punitive damages award of $3,214,724.62. In a post-trial motion, Falcon elected the remedy of rescission, and the judgment accordingly refers to the $1,704,228.79 award as a "rescission component." The amount of the punitive damage award corresponds exactly to the amount DHL asked the jury, in closing argument, to award DHL on its counterclaim for breach of contract.

6

Preemption may be either express or implied. *Delta Air Lines, Inc. v. Black*, 116 S.W.3d 745, 748 (Tex. 2003), *cert. denied*, 540 U.S. 1181, 124 S. Ct. 1418 (2004). Whether a claim is preempted is an issue of law we review de novo. *See Meredith v. La. Fed'n of Teachers*, 209 F.3d 398, 404 (5th Cir. 2000); *Skilled Craftsmen of Tex., Inc. v. Tex. Workers' Comp. Comm'n*, 158 S.W.3d 89, 93 (Tex. App.—Austin 2005, pet. dism'd).

Both the ADA and FAAAA have express preemption provisions. The ADA's provides:

> A State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route or service of an air carrier . . . .

49 U.S.C. § 41713(b)(4)(A). Through this provision, Congress expressly preempted state law as applied to the price, route, or service of an air carrier. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S. Ct. 2031, 2036 (1992). The FAAAA's preemption provision is similar, but it forbids enactment or enforcement of laws, regulations, or other provisions having the force and effect of law related to a price, route, or service of any *motor carrier*. 49 U.S.C. § 14501(a)(1). Both provisions have the same breadth and express a "broad pre-emptive purpose." *See Morales*, 504 U.S. at 384, 112 S. Ct. at 2037 (adopting standards in other preemption contexts to conclude that ADA preemption occurs when State enforcement actions have "a connection with or a reference to" airline

7

rates, routes, or services); *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 3709, 128 S. Ct. 989, 994 (2008) (adopting *Morales*'s analysis of ADA provisions in analyzing preemption provisions of FAAAA).

It is undisputed that DHL is both an air carrier and a motor carrier within the statutes' meaning. The question before us, then, is whether enforcement of Falcon's state law fraud claim qualifies as "a law, regulation, or other provision having the force and effect of law related to a price, route, or service" of DHL. Several decisions of the United States Supreme Court and the Texas Supreme Court provide the framework for our analysis.

### 1. U.S. Supreme Court trio: *Morales, Wolens, Rowe*

In *Morales v. Trans World Airlines, Inc.*, the Supreme Court construed the ADA's preemption provision as having a broad scope. 504 U.S. at 383, 112 S. Ct. at 2037. The National Association of Attorneys General had promulgated Air Travel Industry Enforcement Guidelines to address allegedly deceptive airline fare advertisements. *Id.* at 379. The guidelines contained detailed standards governing the content and format of airline advertising, the awarding of premiums to frequent fliers, and the payment of compensation to passengers who voluntarily give up seats on overbooked flights. *Id.* Noting that Congress included an express preemption provision in the ADA "to ensure that the States would not undo federal deregulation with regulation of their own," the Court held that the ADA preempted

8

all state enforcement actions that have "a connection with or reference to airline 'rates, routes, or services.'" *Id.* at 378, 384, 112 S. Ct. at 2034, 2037. The Court rejected a reading of the statute that would preempt only state laws prescribing rates, routes, or services; it likewise rejected the notion that only laws specifically addressed to the airline industry were preempted. *Id.* at 385–86, 112 S. Ct. at 2037–38. It reasoned that because the guidelines would impact airlines' fares and airlines' ability to market their product, the guidelines clearly "related to" fares and, accordingly, were preempted. *Id.* at 384, 112 S. Ct. at 2037. The Court also rejected the contention that a finding of preemption would give air carriers "*carte blanche* to lie to and deceive consumers" by noting that the Department of Transportation had regulatory authority to prohibit deceptive or unfair business practices that hinder competition in the industry. *Id.* at 390–91, 112 S. Ct. at 2040.

In *American Airlines, Inc. v. Wolens*, the Court again found ADA preemption of claims based on state statutes designed to protect consumers from fraud in the airline industry. 513 U.S. 219, 115 S. Ct. 817 (1995). Importantly, *Wolens* also created an exception to the ADA's broad preemption provision: it held that the ADA's preemption provision does *not* extend to contract claims "alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings," provided the parties did not rely on state laws or policies external to the agreement to enlarge

9

contractual obligations or enhance their bargain. 513 U.S. at 228, 115 S. Ct. at 824. In *Wolens*, members of a frequent flyer program sued an air carrier for alleged violations of Illinois consumer fraud statutes and for breach of contract based on retroactive changes to the frequent flyer program. *Id.* at 224–25, 115 S. Ct. at 822. Noting the inherent potential in state consumer protection laws for intrusive regulation of airline marketing practices, the Court reiterated that the ADA's purpose was to leave largely to the airlines themselves, and not at all to the states, the selection and design of marketing mechanisms appropriate to the furnishing of air transportation services. *Id.* at 228, 115 S. Ct. at 823. Because the Illinois state consumer fraud statutes at issue, like the guidelines at issue in *Morales*, "serve[d] as a means to guide and police the marketing practices of the airlines," the ADA preempted the plaintiffs' consumer fraud claims. *Id.*, 115 S. Ct. at 823.

Not so for the breach of contract claims. *Id.*, 115 S. Ct. at 824. The Court reasoned that Congress did not intend the ADA to shield airlines from "suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings." *Id.* at 227, 115 S. Ct. at 824. Rather, "the ban on enacting or enforcing any law 'relating to rates, routes, or services' is most sensibly read, in light of the ADA's overarching deregulatory purpose, to mean 'States may not seek to impose their own public

10

policies or theories of competition or regulation on the operations of an air carrier.'" *See id.* at 229 n.5, 115 S. Ct. at 824 n.5 (quoting brief of United States as *amicus curiae*). The Court explained that the parties' contract was a privately ordered obligation, and, provided the parties did not rely on state laws or policies external to the agreement to enlarge the carrier's contractual obligations or enhance the parties' bargain, contract enforcement did not amount to a state's attempt to "enact or enforce any law, rule, regulation, standard, or other provision" as prohibited by the ADA. *Id.* at 228–29, 115 S. Ct. at 824; *see also* 49 U.S.C. § 41713(b)(1). The DOT's lack of authority to investigate or resolve breaches of contract, the court reasoned, supported the conclusion that the ADA did not preempt claims for breach of an airline's self-imposed obligations. *Wolens*, 513 U.S. at 232, 115 S. Ct. at 825 (noting "the DOT has neither the authority nor the apparatus required to superintend a contract dispute resolution regime"); *cf. Morales*, 504 U.S. at 390–91, 112 S. Ct. at 2040 (noting the DOT's authority to investigate unfair business practices).

Most recently, the Court held a Maine statute that imposed "service-determining" obligations on carriers shipping tobacco was preempted by the FAAAA. *Rowe*, 552 U.S. at 373, 128 S. Ct. at 996. Among other things, the statute required retail recipients of tobacco shipments to use an elaborate recipient-verification service, and provided that a person is deemed to know that the package

11

contains a tobacco product if it is marked in a certain way or if the sender's name appears on a list compiled by the Maine Attorney General. *Rowe*, 552 U.S. at 368–69; 128 S. Ct. at 993–94. A group of air carrier associations challenged the "recipient-verification" and "deemed-to-know" provisions of the law, arguing the provisions were preempted by the FAAAA. *Id.* at 369; 128 S. Ct. at 994. The Court concluded that allowing Maine to *require specific actions and services* by carriers "could easily lead to a patchwork of state service-determining laws, rules, and regulations . . . inconsistent with Congress' major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace." *Id.* at 373, 128 S. Ct. at 996. Accordingly, it found these provisions had a significant impact on air carriers that interfered with Congress's objectives: it would produce "the very effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for 'competitive market forces.'" *Id.* at 372, 128 S. Ct. at 995.

   2.   **Texas Supreme Court duo:  *Kiefer* and *Black***

   Two decisions of the Texas Supreme Court reflect the breadth of ADA preemption and the narrowness of the *Wolens* exception for certain breach of contract claims. *Continental Airlines, Inc. v. Kiefer*, involved two consolidated personal injury cases. In one, a passenger claimed she was injured when a briefcase fell from an overhead storage bin and struck her head. 920 S.W.2d 274,

275 (Tex. 1996). In the second, a passenger claimed he fell and was injured while trying to make his connecting flight because the airline negligently failed to provide meet and assist services. *Id.* at 275–76. Following *Morales* and *Wolens*, the court conducted a two-step inquiry to determine whether the ADA preempted the passengers' negligence claims. *Id.* at 281. The court asked, first, whether the claims "related to" airline rates, routes, or services and, second, whether the claims constituted the enactment or enforcement of a state law, rule, regulation, standard, or other provision. *Id.* The court concluded that, although the plaintiffs' negligence claims did not relate to airline rates and services as directly as the claims in *Wolens* did, "the impact of tort liability on an airline's services [wa]s no less real" and was certainly not as "tenuous, remote, or peripheral" as a prohibition against obscenity in advertising—the example *Morales* gives of a state law that likely would lie outside the scope of the ADA's preemption clause. *Id*. The court continued: "Tort liability cannot but have, in *Morales'* words, 'a significant impact upon the fares [airlines] charge,' just as the advertising guidelines in that case." *Id*. (citation omitted). The court thus concluded the negligence claims "related to" the airline's rates, routes, or services. *Id.*

But, the court concluded, the plaintiffs' negligence actions did not satisfy the second prong of the preemption analysis. Because negligence actions do not "carry the same 'potential for intrusive regulation of airline business practices

13

inherent in state consumer protection legislation,'" they did not amount to the enforcement of a state law. *Id.* at 282 (quoting *Wolens*, 513 U.S. at 227, 115 S. Ct. at 823). The court explained: "Simple negligence law . . . is far more policy–neutral than specific–purpose legislation, like consumer protection laws." *Id.* While the court concluded the negligence claims were not preempted, it stopped short of declaring that personal injury claims are always saved from preemption. *Id.* Rather, it hinted other tort claims—and even some negligence claims—may be preempted because they carry with them a greater risk that state policies will be too involved, especially when a claimant seeks punitive or mental anguish damages. *Id*. at 282. Observing that neither plaintiff sought such damages, the court held that "the ADA does not preempt common-law personal-injury negligence claims against air carriers, subject to the reservations we have expressed as to damages." *Id*. at 283.

By contrast, in *Delta Air Lines, Inc. v. Black*, the court held the ADA preempted Black's fraud, negligent misrepresentation, and breach of contract claims. 116 S.W.3d at 747. Black and his wife bought round-trip, first-class tickets on a flight that Delta had overbooked. Delta denied Black's wife a first-class seat for the flight out, but offered several alternatives, each of which included vouchers for use on a later flight. *Id.* The Blacks refused these alternatives and sued. *Id.* at 748. The court applied the two-part analysis it used in *Kiefer*. First, it

14

concluded the claims involving boarding and seating procedures "related to" Delta's services, noting that "seating policies and boarding procedures are not peripheral to the operation of an airline, but are inextricably linked to the contract of carriage between a passenger and the airline and have a definite 'connection with, or reference to' airline services." *Id.* at 753 (quoting *Morales*, 504 U.S. at 384, 112 S. Ct. at 2037).

Second, the court rejected the court of appeals's conclusion that federal law did not preempt Black's misrepresentation claims. The lower court's reasoning—that Black's claims were not premised on a law imposed by a Texas legislative body—could not withstand scrutiny, because state common law actions "can be state enforcement." *Id.* at 756. The court reasoned that both *Wolens* and *Kiefer* "suggest that state misrepresentation and fraud claims are preempted by the ADA," and that Black's misrepresentation claim was "comparable" to a claim under a consumer fraud statute because both "would impose state policies on the operation of air carriers that are external to the parties' agreement." *Id.* at 757. For these

15

reasons, the court concluded Black's misrepresentation and fraud claims were preempted.[3] *Id.*

### 3. Falcon's fraud claim

We now apply these principles, and the two-part *Kiefer* analysis, to Falcon's fraud claim. We determine, first, whether Falcon's claim is "related to," or, in the words of *Morales*, has "a definite 'connection with, or reference to'" DHL's rates, routes, or services. *Morales*, 504 U.S. at 384, 112 S. Ct. at 2037; *Kiefer*, 920 S.W.2d at 281. To do so, we must consider the nature of Falcon's fraud claim. It is not "service-determining" in the sense that the Supreme Court used that term in *Rowe*. 552 U.S. at 373, 128 S. Ct. at 996. This is because Falcon does not seek, by its fraud claim, to compel DHL either to perform a particular service or to perform a service in a particular way, as the Maine legislature did when it passed the statute at issue in *Rowe*. *Id.*, 128 S. Ct. at 996. Nor is Falcon's claim premised on a complaint about the manner in which DHL performed or failed to perform its package delivery services. It is not, for example, a claim seeking damages for a lost or untimely delivered package. In this sense, it is not as directly "related to" the air and motor carrier's services as were the claims in *Black*. Falcon's claim, in

---

[3] The court also concluded Black's breach of contract claim was preempted. Delta and Black's contract expressly incorporated federal regulations providing a uniform system of compensation to passengers who, like Black, had been denied boarding. But Black sought to ignore the parties' bargain in that respect and instead use state law to enlarge Delta's obligations to him. Accordingly, it did not fit within the *Wolens* exception and was preempted. *Black*, 116 S.W.3d at 756.

16

essence, is about what DHL said or, more precisely, failed to say to Falcon *about DHL's package delivery services* before Falcon entered into the assumption agreement. Falcon summarized its liability theory as follows: "By making false and misleading disclosures intending to influence those doing business with DHL, and failing to disclose the whole truth, DHL fraudulently induced Falcon to enter into a contractual relationship as a reseller and pay off another's debt to DHL." In short, Falcon contends Texas common law imposed a duty on DHL to disclose fuller information to Falcon, its customer and an intermediary between DHL and DHL's end users, about DHL's future plans for its domestic package delivery service operations. While the relationship between Falcon's claim and DHL's services is not as direct as *Rowe* or *Black*, we nevertheless conclude Falcon's claim has "a definite connection with, or reference to"—and is not peripheral to—DHL's package delivery services. *Morales*, 504 U.S. at 384, 112 S. Ct. at 2037 (a claim relates to rates, routes or services if it has "a definite 'connection with, or reference to'" them). Accordingly, Falcon's fraud claim "relates to" DHL's prices, routes or services within the meaning of the ADA and FAAAA. *Morales*, 504 U.S. at 384, 112 S. Ct. at 2037 (construing "relate to" broadly and holding guidelines governing airfare advertisements relate to rates, routes or services); *Wolens*, 513 U.S. at 224–25, 115 S. Ct. at 822 (claims arising from changes to airline's frequent flier program relate to rates, routes, or services); *Black*, 116 S.W.3d at 749–50

17

(complaint about procedures used for compensating passengers denied boarding due to overbooking relates to rates, routes, or services).

We also conclude that Falcon's recovery on its fraud claim, if permitted, would constitute the enactment or enforcement of a state law, rule, regulation, standard, or other provision. Falcon and DHL are parties to two contracts, the assumption and reseller agreements, which reflect voluntary, self-imposed obligations of DHL. But Falcon does not seek to enforce its contracts with DHL, nor did it seek merely to rescind them. What Falcon sought, instead, was to deploy Texas common law to undo its bargain and punish DHL through a punitive damages award. We conclude permitting Falcon's recovery in this circumstance "would impose state policies on the operation of [DHL] that are external to the parties' agreement" in a way that would have too great a regulatory effect on DHL's marketing mechanisms, which Congress intended to leave largely to the air and motor carriers themselves, and not at all to the states. *See Black*, 116 S.W.3d at 757 (citing *Wolens*, 513 U.S. at 229 n.5, 115 S. Ct. at 824 n.5). Indeed, we see no meaningful distinction between the consumer protection guidelines found preempted in *Morales*, on the one hand, and Falcon's fraud claim, on the other. Falcon, through its fraud claim, seeks to have our state's law dictate the content of Falcon's disclosures in its arm's length contract negotiations with a reseller, just as the guidelines in *Morales* sought to govern the content of airlines' fare

18

advertisements. We believe *Morales* thus compels the conclusion that Falcon's fraud claim is preempted.

Authorities of the Texas Supreme Court also weigh in favor of this conclusion. *Kiefer* recognizes that tort law has a greater regulatory effect than contract law and thus creates a "greater risk that state policies will be too much involved." 920 S.W.2d at 282. Albeit in dicta, *Kiefer* also recognizes that the presence of a punitive damages claim exacerbates this risk. *Id.* And *Black*, decided seven years after *Kiefer*, likewise observes that "both *Wolens* and *Kiefer* suggest that state misrepresentation claims are preempted by the ADA." 116 S.W.3d at 756. *Black* also supports our reliance on *Morales* by noting that claims under a consumer fraud statute are comparable to common law claims for misrepresentation, because both would impose state policies on the operation of air carriers that are external to the parties' agreement. *Id*.

Decisions of the federal circuit courts likewise favor preemption of Falcon's fraud claim. In a case we find strikingly similar to this one, the Fifth Circuit concluded the ADA preempted a travel agency's fraud and other tort claims against American Airlines. *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 284 (5th Cir.), *cert. denied*, 537 U.S. 1044, 123 S. Ct. 659 (2002). Lyn-Lea Travel, a travel agency, entered into a contract providing for Lyn-Lea's lease of terminals that would allow it to book its clients' flights on American. *Id.* Two

19

months later, American announced modifications to its domestic commission schedule that "drastically reduced" the commissions it would pay Lyn-Lea. *Id.* Lyn-Lea sued American, asserting fraud and other claims, contending American knew about and should have disclosed the impending changes when it negotiated the agreement with Lynn-Lea. *Id.* at 284–85. American countersued for Lyn-Lea's failure to pay amounts due under the agreement and terminated the agreement. *Id.* at 285. In response to American's counterclaim for breach of contract, Lyn-Lea raised fraudulent inducement as an affirmative defense. *Id.*

The Fifth Circuit concluded that Lyn-Lea's fraud and other tort claims were preempted. *Id.* at 289. It noted that American's relations with travel agents, as intermediaries between carriers and passengers, plainly fell within the ADA's deregulatory concerns. *Id.* at 288. And pointing to the Supreme Court's observation in *Wolens* that the ADA's purpose was to leave largely to the airlines themselves, and not at all to the states, the selection and design of market mechanisms appropriate to the furnishing of airline services, the Fifth Circuit

20

concluded that Lyn-Lea's claims had the requisite "connection with" American's prices and services to be preempted.[4] *Id.*

Two Seventh Circuit cases have also found analogous fraud claims preempted. In *United Airlines, Inc. v. Mesa Airlines, Inc.*, Mesa had a code-share agreement with United under which it flew commuter routes for United. 219 F.3d 605, 606 (7th Cir. 2000). In 1995, the parties added new Mesa routes and extended the agreement for ten years. *Id.* As part of this agreement, Mesa was required to and did purchase a number of planes from United. *Id.* Two years later, United replaced Mesa with a rival for several routes, costing Mesa significant revenues. *Id.* at 607. Mesa ceased service to some markets, and United terminated the agreement and sought damages for Mesa's breach. *Id.* Mesa countersued, asserting United fraudulently induced Mesa to enter into the ten-year extension agreement and purchase additional planes. *Id.*

The Seventh Circuit noted that *Wolens* permits suits against an air carrier to enforce voluntarily undertaken obligations so long as the state action is limited to

---

[4] The Fifth Circuit, however, reached the opposite conclusion regarding Lyn-Lea's fraudulent inducement *defense*. *Lyn-Lea*, 283 F.3d at 290. The court explained that in *Wolens*, the Supreme Court held breach of contract claims were not preempted insofar as they sought only to enforce "the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." *Id.* at 289 (quoting *Wolens*, 513 U.S. at 233, 115 S. Ct. at 826). The court reasoned that fraudulent inducement, when asserted as a defense to a breach of contract claim, does not reflect a state policy seeking to expand or enlarge the parties' agreement; rather, it concerns the issue of whether mutual assent existed in the first instance. Therefore, Lyn-Lea's fraudulent inducement *defense* was not preempted. *Id*. at 290.

21

enforcing "the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." *Id.* at 609 (quoting *Wolens*, 513 U.S. at 233, 115 S. Ct. at 826). But, the court explained, Mesa's suit was "not by any stretch of the imagination a request to enforce the parties' bargains; it [wa]s a plea to replace those bargains with something else." *Id.* Accordingly, the court held Mesa's fraud claim preempted. *Id.* at 610.

A recent Seventh Circuit case is similar. In *S.C. Johnson & Son, Inc. v. Transport Corp. of America, Inc.*, S.C. Johnson, a customer of air carriers, was injured in a scheme in which its employee took kickbacks from the carriers in exchange for contracting with them (on S.C. Johnson's behalf) so as to require S.C. Johnson to pay the carriers above-market rates. 697 F.3d 544, 546 (7th Cir. 2012). The court held S.C. Johnson's fraud and fraud by omission claims preempted because each sought to "substitute a state policy (embodied in law) for the agreements that the parties had reached." *Id*. at 557. The court noted that, in the air sector, the DOT remains available to address any problems of this ilk that may exist, and that one problem with permitting claims such as S.C. Johnson's is that "one state's deceptive practice might be another state's hard bargain." *Id*. It reasoned that state laws governing deceptive business practices, while well-meaning, are designed to protect consumers from the rigors of the market, but

Congress decided "in both the ADA and FAAAA that it did not want (nor did it want the states) to displace the market in this way." *Id.*

Finally, the fact that the DOT is authorized to investigate claims of unfair or deceptive practices by air and motor carriers supports our conclusion. *See* 49 U.S.C. § 41712; 14 C.F.R §§ 302.403–.404. Falcon contends DOT's regulations are inadequate, mostly because the regulations do not provide Falcon a remedy. *See* 49 U.S.C. § 41712(a); 14 C.F.R §§ 302.403, 301.404(a) (authorizing DOT to investigate allegations of "unfair or deceptive practice or an unfair method of competition" and providing that any person may file a formal or informal complaint concerning a violation of statute or DOT regulations). Even if the relief available to Falcon under the DOT's regulatory authority is not akin to the remedy Falcon could obtain in a state court, were its claims not preempted, we note that *Morales* and *Wolens* pointed to the DOT's regulatory authority as a factor that weighed in favor of preemption in those cases. *See Morales*, 504 U.S. at 391, 112 S. Ct. at 2040 (noting "DOT retains the power to prohibit advertisements which in its opinion do not further competitive pricing"); *Wolens*, 513 U.S. at 228 n.4, 115 S. Ct. at 823 n.4 ("DOT retains authority to investigate unfair and deceptive practices and unfair methods of competition by airlines, and may order an airline to cease and desist from such practices or methods of competition.").

23

Falcon relies primarily on another federal circuit case, *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186 (3d Cir. 1998), to argue against preemption. *Taj Mahal* held a common law defamation claim and an accompanying punitive damages claim were not preempted. *Taj Mahal Travel, Inc.*, 164 F.3d at 195. The Third Circuit reasoned that *Morales* and *Wolens* did not apply to preempt common law, as opposed to statutory, claims and that because the underlying tort, defamation, was not preempted, the punitive damages claim was not preempted. *Id.* We find Falcon's reliance on *Taj Mahal* unavailing, both because (1) unlike the Third Circuit, the Texas Supreme Court, in *Black*, noted that common law claims can be preempted, and read *Wolens* to mean they were, and (2) following *Taj Mahal* would require us to ignore *Kiefer*'s strong suggestion that punitive damages are preempted.[5]

We hold Falcon's common law fraud claim and its punitive damage award are preempted by the ADA and FAAAA because permitting the claims would allow our State's law to serve "as a means to guide and police the marketing practices of" an airline or motor carrier. *See Wolens*, 513 U.S. at 228, 115 S. Ct. at

---

[5]     Falcon dismisses *Kiefer*'s discussion regarding punitive damages as dicta. We agree that it is, but note that many courts have nevertheless relied on and echoed *Kiefer's* prescient reasoning. *See Henson v. Sw. Airlines Co.*, 180 S.W.3d 841, 844–45 (Tex. App.—Dallas 2005, pet. denied); *Whitten v. Vehicle Removal Corp.*, 56 S.W.3d 293, 308–09 (Tex. App.—Dallas 2001, pet. denied); *see also Travel All Over the World v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 n.8 (7th Cir. 1996) (holding that plaintiff's punitive damages claim was preempted under *Wolens*).

823; *see also Morales*, 504 U.S. at 384, 112 S. Ct. at 2037 (holding ADA preempted state attorney general guidelines governing airfare advertising); *Kiefer*, 920 S.W.2d at 281 (suggesting tort claims accompanied by punitive damages claims are preempted); *Lyn-Lea*, 283 F.3d at 284 (finding preemption of fraud clams of travel agent, an intermediary between airline and passengers, based on airline's failure to disclose plans to reduce travel agent's commissions before airline entered into new lease agreement with travel agent); *Mesa*, 219 F.3d at 606 (finding fraud claim by commuter airline Mesa against airline United preempted because Mesa did not seek to enforce United's self-imposed agreement with Mesa but, instead, sought to change parties' bargain by applying state law to agreement and extract damages from United); *see also State ex rel. Grupp v. DHL Express (USA), Inc.*, 19 N.Y.3d 278, 282 (N.Y. 2012) (finding preemption under ADA and FAAAA of plaintiffs' fraudulent misrepresentation claims premised on alleged practices relating to improper imposition of fuel surcharges by DHL where plaintiffs did not sue for breach of contract but, instead, brought qui tam action under New York False Claims Act).

We sustain DHL's first issue. Given our resolution of this issue, we do not address DHL's issues two, three, four, and six, or Falcon's contingent cross-issue.

25

**DHL's Counterclaim**

In its fifth issue, DHL contends the jury's finding that $0 would compensate DHL for Falcon's breach of the assumption and reseller agreements is against the overwhelming weight of the evidence. Evidence is factually insufficient if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). In determining whether there is factually sufficient evidence, we must consider and weigh all of the evidence that supports or contradicts the jury's findings. *Plas–Tex., Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). The jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

The jury found that Falcon breached both the assumption and reseller agreements, and Falcon does not challenge those findings on appeal. In response to the corollary damages question, the jury awarded no damages.[6]

---

[6] Question 9 asked the jury: Did Falcon fail to comply with either of the following agreements? The jury answered "yes" for both the reseller and the assumption agreements. No affirmative defense to the breach question was submitted, and, having answered yes to Question 9, the jury proceeded to answer the damages question, Question 10. It asked: "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate DHL for its damages, if any, that resulted from such failure to comply?" The jury was instructed to consider only "the difference, if any, between the amount due to DHL and the amount paid DHL under the agreement between the parties." It answered "$0."

26

The jury heard conflicting evidence about the amount Falcon owed DHL. Shortly before suit was filed, in a notice dated October 24, 2008, DHL claimed Falcon owed $1,634,894.18. In a second notice dated a week later, DHL offered to waive a portion of the amount in dispute if Falcon would stipulate the amount in dispute was $562,000 and pay $966,348.49. It is undisputed that Falcon made no payments to DHL after late September 2008 and that it continued buying DHL's services for several weeks thereafter. As a result, the amount DHL claimed was due increased after September and, by the time of trial, DHL told the jury its damages totaled $3,214,644.62.

Falcon's evidence demonstrated that DHL's invoices and other documentation were not a model of clarity. But, as DHL points out in its brief, there was no evidence that Falcon paid DHL in full. Falcon protested that DHL's claimed damages were inflated, but never testified that Falcon owed nothing. By Bouse's own admission, the spreadsheet he created showed Falcon owed DHL $762,361.78 as of October 27, 2008.

In its response brief, Falcon argues that the jury's damages finding is justified because DHL's damages evidence was internally inconsistent. It asserts that DHL's witnesses themselves disagreed—by about $130,000—about the amount Falcon owed. Falcon also argues the zero damages finding is justified because, due at least in part to software problems, DHL's records were incomplete,

and what existed was in such disarray that DHL's damages experts were compelled to rely on Falcon's records to form their opinions of damages. While this may be good reason for the jury to have discounted DHL's damage model somewhat, there is no evidence that supports the jury's finding that Falcon owed nothing. Accordingly, having reviewed all the evidence, we conclude the jury's finding that $0 would compensate DHL for Falcon's breach of contract is against the great weight and preponderance of the evidence. *See Kitchen v. Frusher*, 181 S.W.3d 467, 476 (Tex. App.—Fort Worth 2005, no pet.) (holding evidence insufficient to support jury's finding of no value of work in quantum meruit claim when uncontroverted evidence showed work did have value); *see also Dow Chem. Co.*, 46 S.W.3d at 242 (quoting *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)) (evidence is factually insufficient when "contrary evidence greatly outweighs the evidence in support of the verdict").

We sustain DHL's fifth issue.

## Conclusion

We hold that Falcon's fraud claim and punitive damage award are preempted by the ADA and FAAAA. We further hold the evidence is factually insufficient to support the jury's finding that $0 would compensate DHL for Falcon's breach of the assumption and reseller agreements. We reverse that portion of the trial court's judgment awarding Falcon damages and other relief on

28

its fraud claim, we dismiss that claim, and we remand DHL's counterclaim for breach of contract for further proceedings consistent with this opinion.[7]

Rebeca Huddle
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.

Justice Jennings, dissenting.

---

[7] Although we hold that Falcon's affirmative fraud claim is preempted, we express no opinion about whether the ADA or FAAAA would preempt Falcon's use of fraudulent inducement *as an affirmative defense* to DHL's breach of contract claim, should it assert such a defense on remand. *See Lyn-Lea*, 283 F.3d at 289 (travel agency's fraud claim against airline preempted but fraudulent inducement defense asserted in response to airline's counterclaim for breach of contract not preempted).